May it please the Court. My name is Colleen Kennedy, representing Appellant Charles Jackson. I'd like to reserve two minutes of my time for rebuttal, if I could. Mr. Jackson was sent to serve a punitive five-month term in the SHU, which is the most restrictive type of confinement in California's prison system, based on a disciplinary conviction that had already been overturned through a successful grievance process. In assessing Mr. Jackson's claims based on his wrongful confinement to the SHU, the district court made three erroneous rulings. First, that Mr. Jackson did not exhaust his administrative remedies. Second, that there was no tribal issue of fact regarding whether the conditions of Mr. Jackson's confinement implicated a liberty interest. And third, that Mr. Jackson could not state a claim based on his First Amendment right to petition for redress of grievances. Time permitting, I'll address each of these rulings, but I would like to start by addressing the exhaustion issue. Defendants argue that Mr. Jackson failed to exhaust his administrative remedies because his SHU term was a separate subject matter from his disciplinary conviction. But the only basis for sending Mr. Jackson to the SHU was the disciplinary conviction. The SHU term was entirely contingent on that conviction, and when the disciplinary conviction was voided by Mr. Jackson's first grievance, his SHU term was voided as well. And this is confirmed by the Department of Corrections Operations Manual. Section 54100.18.3, which is reproduced at page 216 of the excerpts of record, provides that, quote, a decision to order the rehearing of a disciplinary charge acts to void all prior dispositions concerning the CDC Form 115 being appealed. So by winning his first grievance, Mr. Jackson necessarily also won freedom from being sent to the SHU. And we know that this is how prison officials viewed it at the time, because they eventually, after he had been there for five months, they eventually did release Mr. Jackson from the SHU in advance of his minimum eligible release date, even though Mr. Jackson did not successfully complete a second grievance process based on his wrongful SHU transfer. So we know that his release from the SHU could have been based only on his successful first grievance, which overturned his disciplinary conviction. So because Mr. Jackson had obtained all the relief that was available to him through his first grievance, the PLRA did not require him to file a second grievance regarding his SHU term. And for that proposition, I would we've cited several cases in our briefs regarding that issue, and I would just direct the Court to the Brown v. Vailoff case, which this Court decided in 2005, in which it held that a prisoner need not continue to pursue a grievance process when he has already obtained all available relief, and also to the Dixon v. Page case from the Seventh Circuit from 2002, in which the Seventh Circuit noted that an inmate should not be required to pursue an additional grievance to seek relief that he had already won. In that case, Your Honors, the inmate had successfully obtained a transfer order, but had never, in fact, been transferred, and defendants argued that he should be forced to file an additional grievance to force the prison to implement the relief that he had won. And the Seventh Circuit, in addressing that issue, posed the question, quote, if a prisoner who wins on his initial grievance must file one further grievance to get practical relief, what is to prevent the prison system from repeatedly failing to follow through and requiring the prisoner to endlessly seek a real resolution? So based on those authorities and the fact that his first grievance had successfully exhausted all available relief to which he was entitled, we would submit that the first grievance was sufficient to exhaust his claims under the PLRA. That assumes, doesn't it, that when you talk about exhaustion, you're talking about benefits to him as an individual rather than benefits to the institution. Is that correct? No, I don't believe it does, Your Honor, because although one purpose of the PLRA may be to put the prison on notice and to give it an opportunity to correct its mistakes, the prison already had that opportunity through the first grievance. And the first grievance You say the prison had to, but the prison is a large institution. In the levels, there are different people looking at it. The primary decision-maker is at level three. When you say they've already had a chance to look at it, the director hasn't yet. The director is the one that can say, change. Yes, Your Honor, but the director did have an opportunity to look at it in the first grievance, and the director ordered that his shoe term should be voided effectively by overturning the disciplinary conviction. But at level three, the director is going to be looking at all the information, right, and be making a determination whether there should be some changes in prison procedures. Doesn't it make sense in this process to do that? This wasn't some method that was adopted so prisoners have to go through hoops. The state of California and the other states had to adopt into this program. California is one of the last to do it. They didn't have to go into this program. They did because the federal statute wanted them to do it. So the benefit that they're getting is that they can improve prisons. Why is it that we just say because the prison has looked at it, that's sufficient, rather than going to the third level to get the director to look at it? Well, Your Honor, again, I would say that the prison and the third level, the director has looked at it and has ordered certain relief, and the question here is whether the inmate must be required in order to be admitted to federal court to file a successive grievance to give the prison and the director yet another opportunity to implement the relief that was already ordered and should already have been implemented. And the cases we cite in our briefs indicate that this should not be required, that a prisoner should not be forced to give the prison or the director yet another opportunity to fix their mistake when they've already had that chance and have already developed the issues. You're saying there's absolutely no difference between the third level and any other level? No, I'm not saying that at all, Your Honor. The third level is certainly the last resort, if you will, and the highest level in the appeal system. The highest level. It's like going to the United States Supreme Court. Yes. No one argues with them after that. That's true. But what I'm saying is that he won, yes, Your Honor. So there's nowhere else to go when you win. That's our position, Your Honor, yes. If the Court has no further questions on the exhaustion issue, I'll just briefly address the district court summary judgment ruling. The district court made three critical errors in ruling that the conditions of Mr. Jackson's confinement did not implicate a liberty interest. First, the district court based its findings concerning the conditions Mr. Jackson faced in the shoe entirely on one defense witness, Mr. Ortiz, who had never been submitted, never been disclosed to Mr. Jackson at any point during discovery and whose testimony was therefore inadmissible under Rule 37C. Mr. Ortiz also lacked any personal knowledge whatsoever of the conditions Mr. Jackson faced because Mr. Ortiz did not work at the Corcoran shoe until four years after Mr. Jackson's confinement. Yet the district court gave complete credence to Mr. Ortiz's testimony in lieu of the conditions. And this leads me to the district court's second error, which is that although it was required on a summary judgment ruling to believe Mr. Jackson and to draw inferences in his favor, the district court completely discounted the evidence that Mr. Jackson presented and instead believed the evidence from Mr. Ortiz, who had no personal knowledge of the conditions. And third, the district court completely ignored the length of Mr. Jackson's confinement in the shoe in contravention of established Supreme Court and Ninth Circuit precedent, which states that the duration of the transfer is a critical factor in the sanded analysis. And finally, in addressing Mr. Jackson's First Amendment claim, the district court ruled that he did not have a constitutional right to a specific grievance procedure. But, of course, Mr. Jackson's claim was not based on a claim of entitlement to a specific procedure, but was based on a right of meaningful access to the procedures that California had already established. So Mr. Jackson's First Amendment claim should also be allowed to proceed. If the Court has no further questions, I'll reserve the remainder of my time. You may. Good morning, Your Honors. Anthony O'Brien, Deputy Attorney General representing defendant's prison officials. Good morning. Prison officials disciplined inmate Jackson after he had struck a doctor. A district court granted defendant's motion for summary judgment and motion to dismiss, and this court should affirm that decision because Jackson did not have a liberty interest in avoiding security housing unit. The record shows that Jackson did receive all the process due to him, and Jackson  filed two separate administrative grievances, one requesting a rehearing of his disciplinary violation, and the other one requesting immediate reversal of his security housing unit term. Now, regarding the first appeal, the court correctly determined that even if he had exhausted that appeal, that he lacked a liberty interest in avoiding the security housing unit. You know, the problem, I don't know why it mystifies me, but it does. The facts are pretty clear, and we don't ignore them, do we? And if we look at the facts here, we see that somebody thought he was supposed to go into, I don't know why we call it the shoe, but I guess that's what we, if they called it that, we understand when we communicate. I don't know why, and I'm not suggesting there's anything about it. But anyway, it's disciplinary. That's why you go disciplinary, and there had been a determination that he shouldn't go, and somebody didn't know that that determination had been made and said, you go on anyway. You just go, and he went. Now, we see those facts. What can we do with it other than say, wait a minute, some mistake's been made? Well, with respect to his placement in shoe. Yes. What Jackson should have done, and what he did initially, is file a grievance regarding his shoe term. What should the administrator have done? You're saying what Jackson should have done. What should the administrator have done? Somebody said to him, this is where you go, and he said he wasn't supposed to go, and the record seems to indicate that he wasn't supposed to go. But he went, because he was ordered there. Didn't he? Well, what the administration should have done is what they did. When they did receive report of the initial order, ordering a rehearing of his shoe term, he was sent back to Tehachapi, where he initially received the rules violation hearing, and prior to the rehearing, that rehearing was dismissed. With regards to release from shoe, as noted under ---- Well, he shouldn't have. As I understand the record, and you can tell me if I'm wrong, that's why I'm asking you the question, as I understand the record, he never should have been in the shoe in the first place. Now, isn't that what the record shows? Well, if the officers had known immediately that his rules violation hearing had been reversed, and if the shoe term had been delayed, then he should have received a release from shoe as soon as possible. He shouldn't have gone. That's the thing. I'm talking about before he was sent to shoe the second time, he shouldn't have gone. At that point, the officers that were responsible for sending him to shoe did not have verification that he should not have been in shoe in the first place. Well, they didn't inquire. That's what I gather the record shows. Now, maybe I'm reading more into it than I should, but I gather the record shows the inquiry was made, because if the inquiry had been made, the record was there to show, no, he doesn't go. But he's a prisoner there in charge. He has to do, I gather, what they tell him to do. Well, and what the Court has said, and especially in regards to the Jones v. Bach case, the contours of the exhaustion requirement with respect to the PLRA are dictated by the administrative regulations of each state. And here, Title 15 clearly said that all necessary documentation shall be attached to the appeal. When Jackson filed his second appeal, he didn't attach the necessary documentation, and as a result, it was sent back to him with an opportunity to attach necessary documentation showing that his original rules violation report had been dismissed. He didn't do that. You see what I'm wondering, and you can tell me whether I'm right or wrong. Let's say he didn't attach it, but what he would have had would have been a copy of records that would have been on file for anybody who was interested to see. And the question here is whether they should have been interested. And I gather they should have been because the issue was considered punitive. I don't know what is punitive. I know nothing about it. But it was considered, and he was sent. And the record says he shouldn't have been sent. Doesn't it? Ultimately, yes, he should not have been sent. However, all we have, you know, to guide us with this is what the Supreme Court has stated with regards to the need to properly exhaust under Woodford v. Noe, as well as. . . The Supreme Court always speaks after a fact has taken place, something has happened. Here, the Supreme Court doesn't need to speak because the prison had regulations. And when somebody is supposed to go to the shoe, you have records that show it. Now, you say he didn't attach. Well, and I gather you're right. He didn't. But that's all right because all he would have. . . Well, I'm going to say it's all right. Maybe he didn't follow the procedures, but the record was there. And somebody in this prison decided he must go. And he sent him without checking to see that he wasn't entitled to go. Now, I'm not trying to shortcut it, but isn't that the State's record? Yes. That's what's stated in here is that he had apparently told correctional officers that he would have his rules violation report reversed. However, there was no independent documentation verifying that. I don't know that. Maybe you really would. Go ahead, sweetie. Why would he have to file another appeal? In other words, he has this discipline problem. He appeals that. He wins. The only consequence of his discipline problem was that he got sent to the shoe, right? So he wins his discipline challenge, which means he shouldn't be in the shoe. So why does he have to file another piece of paper to complain about something that he just won? In other words, does he have to say, because you don't follow your own pieces of paper, I have to file another appeal? Well, in this case. I mean, why doesn't the Brown case kind of mitigate any further appeals? Here, the Brown case doesn't mitigate it because Jackson, there was further relief available here. And Jackson knew that there was further relief available. Even though his rules violation report had been ordered, reissued and reheard, he still knew that there was a pending shoe term that needed to be reversed. But the shoe term was totally dependent on the rules violation, right? Not necessarily, no. Although it's connected. Why was he in the shoe? It was because of the rules violation. However. Well, there you have it. And he got the rules violation reversed. But the shoe term is, whereas the rules violation is determined by a senior hearing officer, the shoe term is decided by a separate entity that has discretion on whether or not to impose shoe on him. And at this point. But they have no discretion if he doesn't have a rules violation, if there's nothing else in his record, right? Correct. So we're kind of right back where we started. In other words, the prison is the prison. And once he gets his rules violation reversed, there's no authority to keep him in the shoe, is there? At this point, they nullified his shoe term as a result of his rules violation report being reheard. But you're basically, just so I understand right, you're saying he has to file, so he has to get his rules violation reversed. And because the only reason he's in shoe is because of the rules violation, he then has to file another appeal to say, even though you have no authority to hold me because I got my rules violation reversed, I'm going to appeal again just to make sure I get out of here. Is that what he has to do? When he knows he has a further remedy in this case, yes. No, no, no. So the answer is yes, he has to file two appeals. Even though he wins, he has to file another one just to make sure they do what they're supposed to do. I'm just trying to understand what he needs to do so we can decide whether he had to do it or not. In this situation, to give the prison an opportunity to correct a possible mistake, yes. Just, I want to know, even if the court decides that Jackson did exhaust, his due process claim is moot by virtue of his rules violation being dismissed, his lost credit time that was accrued as a result of the rules violation was returned to him, and his shoe term was nullified. In addition, he has not stated a liberty interest in this claim. If the court were to look at Wilkinson v. Austin, which stated that an inmate needs to have lost parole eligibility in addition to being in a, in this case it was called a supermax facility, indefinitely, then they have a liberty interest. Here, there is no such, there are no such shoe conditions. He was in shoe for five months. It was not indefinite. He did not lose parole eligibility as a result of being in shoe. In fact, his lost time credits were returned to him. Of that five months, how much of the time he spent in the shoe was longer than he should have spent? Given the, what the court had determined, you know, he... He spent five months, and he spent five months longer than he should have spent. Right. However, what's, if he wasn't in shoe, he would have been in ADSEG. As the record reflects, he had been, he had been charged with assaulting a non-prisoner. Just even waiting for his first hearing, even waiting for his second hearing, he would have been placed in ADSEG in both of those situations because of the severity of his charge. And the record shows that he was in ADSEG. So, in other words, just by the very gravity of the charge, he wouldn't have been able to be in the general prison population. Yes, Your Honor. Yes. And as a result, the conditions that he suffered in shoe were no more severe than what he would have received in ADSEG. Thank you. Thank you. Your time has expired. Good morning again, Your Honors. I just, I want to start off by noting that there's absolutely no support anywhere in the record for the contention that the counsel has just made that Mr. Jackson would have been in ADSEG if he hadn't been sent to the shoe. He was put in ADSEG pending a ruling on his disciplinary conviction. And when that was overturned, there's nothing to indicate that he would not have just been sent back to the general population. And I also just want to be clear, Mr. Jackson's shoe term was not nullified. He actually did serve five months in the shoe. And Judge Ferris is correct. He should not have served one day in the shoe based on the first grievance. And there is, there was documentation, contrary to counsel's assertion, there was an appeal response which was signed by the deputy warden on April 1st, 1998, and that's at page 82 of the record. And Mr. Jackson was not transferred to the shoe until a week later, April 8th, 1998. So there was documentation, and the record does not show why nobody figured this out before or until five months after Mr. Jackson was transferred to the shoe. But he did receive the relief in his first grievance, and he should not have been sent. And I would analogize it to a case where a criminal defendant receives, is able to overturn his conviction on appeal. He does not have to then file a second appeal to be released from prison. The relief is encompassed within the initial. You can correct me if I'm wrong, but I understand. Mr. Jackson advised the person who told him where he should go that he shouldn't go, and the person said, you just go anyway. And he did. That's correct, Your Honor. A prisoner would do. That's correct. But so that even though he didn't have papers or he didn't show him a copy, he put him on notice by telling him, I'm not supposed to go. Doesn't the record show that? The record does show that, Your Honor, that Mr. Jackson talked to Defendant Davis, who is a correctional counselor, and said that he was on the list to be transferred and he wasn't supposed to be. And Defendant Davis told him. And he says, you go anyway. Go ahead and do it. It will be reissued at some point later. Thank you. I see my time is up. Thank you. It is. Thank you, both counsel, for your argument. The case just argued. Jackson and Carey are submitted.
judges: Wallace, Farris, McKeown